**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

<u>**Keith R. McDonough**</u>

    **v.**                                                    Civil No. 13-cv-164-PB
                                                                Opinion No. 2014 DNH 142
<u>**U.S. Social Security Administration,**</u>
<u>**Acting Commissioner**</u>

<u>**MEMORANDUM AND ORDER**</u>

    Keith McDonough seeks judicial review of a ruling by the
Social Security Administration ("Administration") denying his
application for disability insurance benefits ("DIB") and
supplemental security income ("SSI").  For the reasons set forth
below, I deny McDonough's request and affirm the decision of the
Commissioner.

I.   <u>**BACKGROUND**</u>[1]

A.   <u>**Procedural History**</u>

    This action is an appeal from a final administrative
decision dated March 26, 2012 denying Plaintiff's claims for
Title II disability benefits.  Plaintiff filed his applications

---

[1] The background information in parts A and B is taken verbatim
from the parties' Joint Statement of Material Facts, Doc. No.
16, omitting citations to the record and with slight changes to
paragraph structure.

for benefits on February 17, 2011, alleging a disability onset date of August 3, 2010.  Plaintiff's applications were denied on June 15, 2011.  He filed a timely request for hearing before an administrative [l]aw judge. The hearing was held on March 13, 2012.  ALJ Sutker issued an Unfavorable Decision on March 26, 2012.  On May 16, 2012, the Plaintiff requested an Appeals Council review.  On February 6, 2013, the Appeals Council denied review.

**B.**   **Medical Records Summary**

On February 22, 2009, Plaintiff was seen by Dr. Robert Liscio at the Southern New Hampshire Medical Center ("SNHMC"). The impression of Liscio was that Plaintiff's lateral clavicle had an unusual appearance with some calcification and a widened AC joint.  Dr. Liscio reported that this was probably from an old AC joint separation.  On January 27, 2010, Plaintiff was seen at St. Joseph Hospital.  Plaintiff complained of right-sided low back pain; occasional episodes of right leg/foot sleeping over last couple of weeks; and pain described as burning.

On March 13, 2010, Plaintiff was seen at SNHMC.  Plaintiff reported that he had been very depressed and was having suicidal ideation.  He reported that "everything is wearing on me."  When asked how he would describe his marriage, he reported that "it sucks."  He said that he does not want to "do it" anymore, that

2

he is tired and cannot keep up the façade, that he is happy.  He
reported that he had several suicide attempts including overdose
and cutting himself; had been treated for substance abuse
including cocaine[,] pills and heroin; had some low back pain;
had been to the emergency room a couple of times for this; and
has had a number of head injuries from motor vehicle accidents,
wrestling, skateboarding, and having been hit by a 2x4.  Upon
mental status examination, he said his mood was depressed and
that he had significant sleep difficulties, including difficulty
falling asleep, not awakening in early morning, which impaired
his concentration and memory.  His appetite was okay, although
he noted that he only ate once per day.  His energy was
decreased.  He admitted to irritability, anhedonia, and suicidal
thoughts.  He presented with significant signs and symptoms
consistent with major depression.  Plaintiff was diagnosed with
Major depression recurrent, rule out bipolar disorder; lower
back pain.  He was admitted to the Behavioral Health Unit and
was started on a Citalopram trial.

     On March 19, 2010, Plaintiff was seen at SNHMC by Dr.
Philip Sullivan, who reported that this was the first Behavioral
Health Unit admission for this 37-year-old white male with a
history of polysubstance abuse and dependence who presented with
acute depressive symptoms with suicidal ideation; he complained
of lethargy, anergia, anhedonia, and difficulty sleeping.  He

3

did not need any detoxification from alcohol.  To address his major depression and neurovegetative symptoms, he was started on the antidepressant medication, Citalopram.  This medication was specifically chosen because that is one of only a few that is available at a very low cost at discount pharmacies.  To address his anxiety symptoms, a trial of Vistaril was initiated.  His affect was subdued, but positive.  He was diagnosed with major depression, severe, recurrent (296.33); anxiety disorder, NOS, with features of generalized anxiety, social anxiety, panic disorder; agoraphobia (300.00); and polysubstance abuse with a history of polysubstance dependence (304.80).  A Plaintiff's Global Assessment of Functioning on admission was 35 due to acute and compelling suicidal ideation in the context of polysubstance abuse and major depressive symptoms.  On discharge, the patient is reporting a significant improvement in mood, commitment to sobriety, and resolution of all suicidal thoughts (55).

On March 31, 2010, Plaintiff was seen at Community Council of Nashua (now GNMHC) ("GNMHC["]) for re-opening psychiatric evaluation by Dr. Phillip Santora (psychiatrist) and Kate Murphy, MA, Intake Clinician.  Plaintiff reported that he had been isolating more and had noticed a decrease in his motivation.  Plaintiff reported that he had slipped in his sobriety, as well as suicidal thoughts within the last month.

Plaintiff reported feelings of hopelessness and is afraid to do things, particularly interviewing.  Plaintiff reported middle insomnia and racing thoughts; increased energy and lack of appetite; two previous hospitalizations in 1994 and 1995, following suicide attempts, one of which was an overdose and the other was cutting his wrist.  Plaintiff also reported that when he is drinking, he is unable to stop drinking.  He reported that he had previously been sober since May of 2009 until most recently.  Upon mental status evaluation, Plaintiff had a rigid and tense attitude; depressed and anxious facial expressions; somewhat fidgety body movements; pressured speech; an overabundant thought process; a depressed and anxious mood; and difficulties with middle insomnia.  Plaintiff was diagnosed with major depressive disorder; rule out anxiety disorder, NOS; alcohol dependence, sustained partial remission; cocaine abuse, sustained full remission, and R/O Personality Disorder, cluster C type.  He was assigned a GAF score of 50.  The treatment plan was that Plaintiff would be seen for cognitive behavioral therapy with an emphasis on reduction of negative symptoms, associated with client's major depression.  The focus of the treatment would be on increasing coping skills in order to stabilize moods and improve overall functioning[ ].  It was noted that psychoeducation would be provided with regard to Plaintiff's substance abuse and its impact on overall

functioning and its effects on mental illness.

On May 6, 2010, Plaintiff was seen at GNMHC for a Psychiatric Evaluation by Dr. Zlatko Kuftinec.  Dr. Kuftinec noted that Plaintiff reported difficulties with emotional control.  He stated that he had been anxious for the past number of years and had been feeling depressed.  He noted that recently Plaintiff had been briefly hospitalized at the West Campus in Nashua because of inability to cope and suicidal ideation.  He stated that Plaintiff reported a history of panic attacks and social phobic response.  He stated that Plaintiff claimed that as far back as he can remember, perhaps when he was 14 or 15, he had a severe fear of developing a condition that rendered him paralyzed with fear.  He stated that he would feel that he was going to die; his heart was racing; he was sweating profusely; and he had the opinion that he was getting crazy that would end eventually with his trying to avoid the situation in which he found himself confined.  Plaintiff reported that he would worry about the next attack or implication[s] of his illness stay[ing] with him throughout his life.  Plaintiff reported that there was a period in his life when he was drinking extensively and was taking all sorts of drugs but he claims that he discovered that that didn't help him and eventually he stopped drinking and stopped taking non-prescription drugs altogether but his condition only got worse.  Upon mental status examination,

Plaintiff's attention was difficult to direct and maintain and his emotions were highly labile with evidence of moderate to severe[] anxiety, panic attacks, depression, anger and irritability.  Regarding his affect, the predominant emotion appeared to be anxiety in the form of panic attacks and anxiety of anticipation.  His memory was impaired for immediate recall, recent and remote events, which was likely due to high degree of anxiety rather than any organic causes.  He had poor attention span/concentration; marginal insight; equally questionable judgment; and poor impulse control.  He was diagnosed with Panic disorder with agoraphobia and alcohol addiction in remission. He was assigned a GAF score of 50.

On July 16, 2010 Plaintiff was seen at SNHMC by Dr. David H. Walker.  Plaintiff complained of persistent pain since injuring his shoulder and back in early July.  Plaintiff reported that about one and a half to two weeks ago he was sitting on the edge of the pool and fell to the ground injuring the left shoulder.  He described pain in the anterior chest wall that radiated along his left shoulder into the trapezius area. He reported that he worked in a facility that requires lifting; had discomfort along the left trapezius, where palpation does exacerbate his discomfort.  There was some muscle spasm noted. He was reproducibly uncomfortable at the anterior chest wall and the anterior left ribs.  Palpation reproduced his discomfort, as

7

does lifting his left arm.  He was diagnosed with persistent left shoulder pain, musculoskeletal in nature and chest wall pain secondary to injury.  Plan: A work release given.  He was advised to limit lifting and use of his left arm until he is cleared by his regular doctor.  A sling was given.  Dr. Walker reviewed daily gentle range of motion exercises with him.  He was also referred on to Orthopedics.  Dr. Walker stated that he may require PT evaluation and/or further diagnostic studies. Dr. Walker stated that the concern is always a rotator cuff injury with this trauma.

On August 25, 2010, Plaintiff was seen at Nashua Area Health Center by Dr. Ajay Sharma.  Plaintiff reported that his hands have been aching for four to five months.  Plaintiff stated that he worked as a chef and was having a hard time chopping vegetables and holding items.  Plaintiff stated he had been taking 2400 mg of Ibuprofen and it was not helping. Plaintiff also stated that when he sat for a while he could not get up because he was stiff.  Patient rates pain on Numeric Scale as 7 out of 10.  On September 10, 2010, Plaintiff was seen at Nashua Area Health Center, Dr. Ajay Sharma, for follow-up joint and low back pain.  Plaintiff stated that now he was taking 3000 mg of Ibuprofen and the Flexeril together and it helped with the pain but he got very tired in the morning. Plaintiff reported Flexeril helped his back and that he was not

able to work with his hands. Plaintiff rated his pain on a numeric scale as an 8 out of 10.

On September 9, 2010, Plaintiff visited Dr. Sharma. Dr. Sharma reported that Plaintiff had tenderness over the paraspinal muscles in the lumbar region. His right upper extremity was mildly tender at the metacarpophalangeal joints b/1. On September 24, 2010, Plaintiff was seen at Nashua Area Health Center by Dr. Ajay Sharma. Plaintiff reported that his hands still hurt and that now his knee hurt. Laboratory work showed positive ANA and RF. A hand x-ray was normal. Plaintiff rated his pain on a numeric scale as 9 out of 10. On October 8, 2010, Plaintiff was seen at Nashua Area Health Center, Dr. Ajay Sharma for follow-up hand/arm pain. He reported that his hips hurt and he still has the other pain too. Vicodin helped his pain. Plaintiff rated his pain on a numeric scale as 9 out of 10.

On November 18, 2010, Plaintiff was seen at SNHMC by Dr. Peter Row, and Deborah A. Smith PA-C. Plaintiff complained of neck and back pain after a motor vehicle accident. Plaintiff reported that when he woke up, he had neck and back pain. Plaintiff reported that his arthritis felt worse because of the car accident that occurred the day before. Plaintiff stated that he did not have any Vicodin and he felt that he needed it for his pain. The impression was that Plaintiff was status-post

motor vehicle accident with muscle strains and was narcotic seeking.  On November 18, 2010, Plaintiff was seen at Nashua Area Health Center, by Dr. Ajay Sharma for a follow-up for joint pain.  Plaintiff reported that he was doing worse and that he was in a car accident in Manchester on Saturday.  Plaintiff reported that he still had pain in hands and had an appointment with rheumatology on December 7.  Plaintiff rated his pain on a numeric scale as 8 out of 10.  Upon examination, Plaintiff had decreased extension in the head and neck.  An examination of the spine, ribs and pelvis showed tenderness over the paraspinal muscles in the lumbar region.  An examination of the right left lower extremity showed straight leg raise limited to 30 degrees due to low back pain, and no numbness or paresthesias elicited. An examination of the left lower extremity showed straight leg raise limited to 30 degrees due to low back and neck pain. On December 3, 2010 Plaintiff was seen at Nashua Area Health Center, Dr. Ajay Sharma for a follow-up for low back pain. Plaintiff reported that he was still having the pain on and off and still had pain in his hands.  Plaintiff reported that he bent down for something and hurt his back.  Plaintiff rated his pain on a numeric scale as 8 out of 10.  On December 8, 2010, Plaintiff was seen at Nashua Rheumatology by Dr. John Gorman FACR for a consultation for arthritic complaints.  Plaintiff reported that his arthritic problems began late last spring with

aching and stiffness in his hands.  He reported that his MCP
joints were the worse areas, right greater than left, and lately
he developed swelling in his MCPs.  He reported that aching and
stiffness has spread to his knees and MTPs of his feet, as well
as the wrists, elbows and shoulders.  He reported that he had
severe generalized morning stiffness and gelling.  He reported
that he was unable to exercise.  He reported that he was laid
off from his job about four weeks ago.  He reported that he
derived benefit from a Medrol Dosepak, and that Vicodin has been
of only modest benefit.  It was reported that Plaintiff's
shoulders have lost about 15% of ROM and show moderate anterior
tenderness.  His wrists were tender and slightly swollen.  He
had diffuse swelling and tenderness MCPs and PIPs of hands.
Grip strength was reduced especially on the right.  The right
knee was slightly swollen and tender.  His feet showed swelling
and tenderness throughout MTPs.  From September 15, 2010, ANA
was positive at 1:40 (nucleolar), and rheumatoid factor positive
at 22 units.  It was noted that Plaintiff likely had Rheumatoid
arthritis, and it was a relatively aggressive onset.  It was
discussed that a poor prognosis [was likely if it was] not
treated aggressively.

On December 14, 2010, Plaintiff received his lab report
signed by Dr. John Gorham.  The report indicated that Plaintiff
had probably had a past or present HCV infection.  On January 3,

11

2011, Plaintiff was seen at Nashua Area Health Center.  Dr. Ajay Sharma noted that Plaintiff's arthritis symptoms were related to Hepatitis C.  Plaintiff rated his pain on a numeric scale as 8 out of 10.  On January 7, 2011, Plaintiff was seen at GNMHC at Community Council, by Kate Murphy, LCMHC.  Ms. Murphy discussed referral to a chronic pain group.  She reported that he presented as well groomed but anxious.  His speech was pressured.

On January 13, 2011, Plaintiff was seen at St. Joseph's Internal Medicine by Donald Reape, MD, who noted that Plaintiff had been diagnosed with Hepatitis C.  Dr. Reape noted that Plaintiff initially presented this summer with joint pain, hand pain and swelling then he developed pain in hips, knees, shoulders and feet.  He was working as a chef.  He was having difficulty with chopping initially and then he just could not keep up with work and was let go in September.  Plaintiff was being seen at the Nashua Area Health Center and was told that he had rheumatoid arthritis and he was referred to Dr. Gorman.  When Plaintiff saw Dr. Gorman he noted an increase in his liver tests and he ordered additional tests, which showed Hepatitis C.  He continued to struggle with pain in both hands, hips, knees and feet.  He had a lot of stiffness, worse in the morning.  Problem #1:  Hepatitis C; Problem #2: Arthritis, generalized.  On January 28, 2011, Plaintiff was seen at St. Joseph Hospital

by Dr. James S. Heath.  Plaintiff was diagnosed with Chronic
Hepatitis, Grade 2, and Stage 3 to 4, consistent with his
Hepatitis C liver biopsy.

The Adult Disability Report dated February 28, 2011, stated
that Plaintiff was claiming disability on the basis of panic
disorder, Hepatitis C, and Arthritis.  The Adult Disability
Report is part of the Title II application process.

On March 8, 2011, Plaintiff was seen at GNMHC at Community
Council by Kate Murphy, LCMHC.  Plaintiff reported feelings of
hopelessness and despair after learning that his Hepatitis C is
at stage 3 of 4.  He presented as somewhat disheveled and with
more depressed mood.  Plaintiff appeared to have difficulty
applying strategies effectively due to his symptoms.  On March
9, 2011, Plaintiff was seen at Family Medical Center by Deborah
Dennis, MD.  Plaintiff reported that he had been very fatigued.
He informed Dr. Dennis that he saw his primary care physician
who found that he had elevated liver enzymes and an elevated
rheumatoid factor and sent him to the rheumatologist, Dr.
Gorman.  However, he was not able to see[ ]Dr. Gorman until late
November 2010.  In the meantime, he was taking 2 to 3 Vicodin a
day plus 6 to 8 extra strength Tylenol a day, so that he was
taking up to 5000 mg of Tylenol a day for the pain in his
joints.  When he did see Dr. Gorman he was anticipating starting
Methotrexate and Prednisone but wanted to check his liver first,

13

and ultimately did a test for Hepatitis C, which was positive.
Dr. Reap[e] has some of his old records and his note from
February 8, 2011, which suggested that his Hepatitis C is
genotype 1A and his viral load was greater than two million.  A
liver biopsy done on January 28, 2011, showed that he had grade
two, stage three-four liver disease.  Plaintiff reported that he
stopped drinking completely three years ago and since then has
only had one drink on two occasions.  Currently the patient has
a pain contract with his primary care physician and takes
Percocet for his joint pains, Alprazolam for anxiety, and
recently Mobic for his joint pains because Ibuprofen upsets his
stomach.  Plaintiff was assessed with Hepatitis C. By report, he
had advanced liver disease from chronic active Hepatitis C,
genotype 1A.  Dr. Dennis reported that it was certainly unusual
to have advanced to this stage of liver disease so quickly since
his risks of contracting the disease began about 15 years ago.
Dr. Dennis stated that undoubtedly his heavy alcohol use played
a role in the velocity of fibrosis.  Dr. Dennis noted that they
had talked about the treatment and some of its possible side
effects.  However, at the moment, Plaintiff had no insurance
that would cover the cost.  He anticipated being eligible for
Medicaid and he has already applied for that and felt that he
would have that support in about three months.  Dr. Dennis noted
that she had explained that his progression would be slowed by

14

the fact that he had stopped drinking, but that he should get treated as soon as possible to avoid end-stage liver disease which could prohibit his ever getting treatment.

On March 9, 2011, Tom Dubois filled out the Adult Function Report for the Plaintiff.  On March 11, 2011, Kuftinec, MD, of the GNMHC filled out a Mental Impairment Questionnaire for the state agency.  He described the plaintiff's mood as depressed, anxious, and his affect as flat.  The AXIS I diagnoses were: panic disorders; alcoholism in remission.

On March 18, 2011, Plaintiff was seen at SJ Internal Medicine by Dr. Donald Reape.  Plaintiff presented for a nurse visit to initiate Hepatitis A and B series as ordered per Dr. Dennis for Dr. Reape.  On March 29, 2011, Plaintiff was seen at SJ Internal Medicine again by Dr. Donald Reape.  Plaintiff complained of Rheumatoid Arthritis.  He reported that his musculoskeletal symptoms started last spring.  He reported that he worked as a cook and noticed he had difficulty using his hands.  He reported that he had pain in the fingers, wrists, knees, hips and toes.  He reported that he noticed loss of grip strength.  He reported that he was fatigued.  He noted that he saw his PCP, Dr. Ajay Sharma, and was diagnosed with Rheumatoid Arthritis.  He reported that he saw Dr. Gorman around November and was presumptively diagnosed with Rheumatoid Arthritis.  He stated that he received prescriptions for Prednisone and

15

Methotrexate.  He reported that he did not start them however as he was subsequently diagnosed with Hepatitis C.  He reported he had muscle aching as well.  He denied joint swelling except for occasional swelling in the fingers.  He reported that he had been unable to work as a cook.  He reported that he tried to go back to school but had dropped out.  The impression was that Plaintiff had Arthralgia.  It was suspected that this was from Hepatitis C which can present with musculoskeletal symptoms of joint and muscle pain.

On March 29, 2011, Plaintiff was seen at SJ Internal Medicine for a rheumatology consultation by Dr. Gonzalez. Plaintiff reported that his musculoskeletal symptoms started last spring, and that he worked as a cook and noticed he had difficulty using his hands.  He reported that he had pain in the fingers, wrists, knees, hips and toes.  He noticed a loss of grip strength.  He reported that he was fatigued, and that he had been unable to work as a cook.  He reported that he tried to go back to school but has dropped out.  He complained of fatigue, malaise, and sleep disorder.  He complained of joint pain, back pain, stiffness and muscle aches.  The impression was that Plaintiff had Arthralgia.  It was suspected that this was from Hepatitis C which can present with musculoskeletal symptoms of joint and muscle pain.

On April 25, 2011, Plaintiff was seen at SJ Internal

Medicine by Dr. Donald Reape.  It was noted that once Plaintiff received Medicaid he would begin treatment for Hepatitis C.  He reported that he had been dealing with chronic pain and had been taking five Percocets per day.  He reported some breakthrough pain.

On May 11, 2011, Plaintiff was seen by Bruce Goss, Ed.D., for a Psychiatric Evaluation.  Dr. Goss reported that Plaintiff's mood was anxious, and that he seemed to live with a fair amount of anxiety – especially in interpersonal relationship[s].  Plaintiff reported having panic attacks and that he had been depressed and was hospitalized March 2010.  It was reported that Plaintiff's content of thought was slightly OCD at times, and he showed some Agoraphobia.  Dr. Goss noted that Plaintiff had a marked degree of functional loss in social interactions and daily activities; a constant degree of functional loss in work-related task performance; and a continual degree of functional loss in stress reaction.  Dr. Goss opined that his anticipated return to work was three to four years.

On May 18, 2011, Plaintiff was seen at GNMHC ("GNMHC") by Carol Copadis.  It was his first visit with this provider.  It was noted that Plaintiff was sober for two years and was seeing a psychiatrist who retired.  It was noted that Plaintiff's stressors included Hepatitis C and wife being tested for

Huntington's.  Plaintiff described himself as depressed and anxious, and reported that at times had difficulty going out. His medications were Xanax, Lorazepam and resume Citalopram.  He was assessed as moderately ill.

On May 20, 2011, Katherine Wescott, RN, evaluated the claimant for medical eligibility for State of NH welfare benefits, including Medicaid.  On May 23, 2011, Joan Scanlon, Ph.D. conducted a Comprehensive Psychological Profile-Adult. The claimant was examined for 45 minutes.  According to Dr. Scanlon, the claimant exhibited mild pressure of speech that improved once he was provided additional structure.  He described his present mood as "pretty sedated" since he was initiated on Citalopram in the previous week, but previously, had been engaging in crying "a couple of times a day," as well as having "really worked up, high anxiety" and sadness.  He acknowledged panic attacks that have largely improved, but were previously marked by hyperventilation, heart palpitations, "sweaty chills", fear of losing control, a sense of impending doom.  The claimant reported reduced appetite, having lost thirty pounds within the last four months, approximately, and continued to describe his sleep as "rocky" marked by early morning wakening three to four times per week, yet currently improved with medication.  He acknowledged a sense of internal numbing, ongoing anhedonia, but denied periods of elation or

18

mood lability, but did report racing thoughts.  Dr. Scanlon's diagnoses were mild dysthymic disorder, polysubstance abuse, in remission, anxiety disorder, NOS, and pain disorder associated with medical condition.

On May 31, 2011, the Plaintiff was medically approved for Aid to the Permanently and Totally Disabled (APTD) program by the Disability Determination Unit for the State of NH.  The reviewer was Katherine Wescott, RN.  It was estimated that the Plaintiff would need three to four years of treatment to return to gainful work.  Disability was determined on the basis of meeting the mental impairment listings under the Social Security Act.  This was based upon a psychiatric evaluation performed by Dr. Goss on May 11, 2011.

On June 14, 2011, Dr. John MacEachran, a nonexamining state agency medical consultant, completed a physical RFC assessment. Dr. MacEachran opined that Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for at least 2 hours in an 8-hour workday; sit for about 6 hours in an 8-hour workday; and was unlimited in pushing and/or pulling.  He also opined that Plaintiff was limited in handling and fingering.

On July 7, 2011, Plaintiff visited Carol Copadis of the GNMHC.  Plaintiff was crying and tearful.  It was reported that Plaintiff had Hepatitis C and had been told that he has 25%

chance of survival.  Plaintiff reported that Citalopram made him
dull.  He was assessed as moderately ill and minimally worse.
The psychiatric medications were revised.  On July 26, 2011,
Plaintiff was seen at SJ Internal Medicine by Dr. Reape.
Plaintiff complained of stiffness and pain back, hips, feet and
hands.  Plaintiff was using the Percocet, which allowed him to
get out and walk.  The impression was that Plaintiff had
Arthralgia, Hepatitis C, anxiety state, unspecified.

On August 2, 2011, Plaintiff was seen at GNMHC by Kate
Murphy, LCMHC.  He reported frequent tearfulness and racing
thoughts which prevent him from sleeping.  He reported
difficulty with acceptance of his medical condition and that of
his wife.  Treatment included engaging in reality testing and
reframing of distorted thinking patterns.  On August 16, 2011,
Plaintiff was seen at GNMHC by Kate Murphy, LCMHC.  He continued
to have difficulty with depressive symptoms related to his
physical illnesses and his wife's decline.  Coping strategies
and self-care skills were reviewed.  On September 2, 2011,
Plaintiff was seen at GNMHC by Tammy Numi, BS.  Plaintiff
reported that he was still anxious over finances, but continued
to stay in school.  On September 2, 2011, Plaintiff was seen at
his home by Tammy Numi, PRS of the GNMHC.  It was reported that
Plaintiff had symptoms of major depressive disorder, as
evidenced by tearfulness, low mood and low motivation, which

impaired his ability to attend scheduled appointments, as well
as participate in outside activities.  On September 13, 2011,
Plaintiff was seen at his home by Tammy Numi, PRS of the GNMHC.
It was reported that Plaintiff's symptoms impaired his ability
to attend scheduled appointments, as well as participate in
outside activities.

On September 27, 2011, Plaintiff visited Kate Murphy,
LCMHC, of the GNMHC. During that session, continued anxiety and
effective use of coping skills were discussed.  Plaintiff
discussed an interest in returning to work part-time.  Ms.
Murphy worked with him regarding stressors and to challenge
distorted thinking patterns.  On October 21, 2011, Plaintiff
visited Carol Copadis of GNMHC.  Ms. Copadis stated that
Plaintiff was moderately ill and had minimally improved.  On
December 14, 2011, Plaintiff was seen by Dr. Reape of SJ
Internal Medicine for a follow-up on anxiety.  It was noted that
Plaintiff switched from Clonazepan to Lorazepam.  Plaintiff
reported having difficulty sleeping.  He was on Methadone, which
had been effective in pain relief.  He continued to struggle
with sleep disturbance.  Plaintiff was given a prescription for
Trazadone, but he found that he was groggy the next day.
Plaintiff stated that he fell asleep, but he got up every couple
hours.  Dr. Reape noted that Plaintiff would be setting up an
appointment with Dr. Dennis to discuss treatment of Hepatitis C

in January.  The impression of Dr. Reape was that Plaintiff had
insomnia; anxiety[,] state[] unspecified and Hepatitis C,
chronic active, genotype 1A.  On January 18, 2012, Plaintiff
visited Ms. Copadis of the GNMHC.  Plaintiff reported that he
was depressed, cried, was upset about wife, and had poor sleep.
Plaintiff was assessed as moderately ill and minimally worse.

On February 22, 2012, Dr. Reape completed a medical source
statement.  Dr. Reape opined that Plaintiff could occasionally
lift and/or carry 20 pounds; frequently lift and/or carry less
than 10 pounds; stand and/or walk for at least 2 hours; sit for
about 6 hours; and was limited in pushing and/or pulling with
his upper extremities.  Dr. Reape also opined that Plaintiff may
never engage in postural activities; was limited in gross hand
manipulation and in fingering; was limited in his ability to
work with temperature extremes, noise, dust, vibration,
humidity/wetness, hazards, fumes, odors, chemicals and gases;
and was not likely to sustain gainful employment.

C.   **ALJ's Decision**

The ALJ applied the five-step sequential analysis for
considering Social Security disability claims.[2]  At step two, the

---

[2]  To determine whether an applicant is disabled, the ALJ follows
a five-step sequential analysis.  20 C.F.R. § 404.1520(a)(4).
The applicant bears the burden, through the first four steps, of
proving that his impairments exist and preclude him from
working.  Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir.
2001).  The applicant must show that (1) he or she is not

ALJ found McDonough's hepatitis C to be a severe impairment and
several other impairments to be non-severe.  These included
several mental impairments and arthralgias,[3] which doctors
initially assumed to be a symptom of rheumatoid arthritis but
later opined were a likely symptom of hepatitis C.  The ALJ
noted that, by December 2011, McDonough's arthralgias was
effectively managed by methadone treatment. Citing medical
opinions, the ALJ next found McDonough's mental health
conditions to be non-severe because the evidence consistently
indicated that, for the majority of the time, McDonough
exhibited a normal mental status.  In making this finding, the
ALJ considered the four broad functional areas for evaluating
mental disorders required by the applicable regulations, finding
that the record showed that McDonough had no limitations in
activities of daily living; mild limitations in social
functioning; mild limitations in concentration, persistence, or
pace; and no episodes of decompensation.  See 20 C.F.R. §
1520a(c)(4).

---

engaged in substantial gainful activity; (2) he or she has a
severe impairment; (3) the impairment meets or equals a specific
impairment listed in the Social Security regulations; or (4) the
impairment prevents him or her from performing past relevant
work.  At the fifth step, the Commissioner must show that a
claimant has the RFC to perform other work that may exist in the
national economy.  Young v. Astrue, 2011 DNH 140, 15-16 (citing
20 C.F.R. § 404.1520(a)(4)).

[3]  Arthralgia is joint pain.  Stedman's Medical Dictionary 159
(28th ed. 2006).

After finding that McDonough's hepatitis C did not meet or medically equal a listed impairment, the ALJ found that McDonough had the residual functional capacity ("RFC") to:

> perform light work . . . except he can stand or walk for 4 hours during an 8-hour workday.  He must avoid climbing ladders, ropes, and scaffolds.   He can frequently handle and finger . . . [and should] avoid more than moderate exposure to dust fumes, odors, gases, and poor ventilation.   He must avoid temperature extremes . . . [and] hazards such as unprotected heights and dangerous moving machinery. He is limited to uncomplicated tasks . . . that can typically be learned in 30 days or less.

The ALJ rooted McDonough's physical limitations in his hepatitis C and the resulting symptomatic hand and foot pain.  She also discussed McDonough's panic disorder and depression.  She discredited McDonough's allegations regarding the limitations arising from these impairments to the extent they were inconsistent with her RFC determination.  In particular, she determined that the medical record failed to support McDonough's allegations of disability and that his reported activities of daily living were "highly inconsistent" with a finding of total disability.  The ALJ explained that she limited McDonough to uncomplicated tasks because of his use of pain medications and their common side effects.  In her discussion of McDonough's mental limitations, she explained that she accorded great weight to the opinions of Drs. Martin and Scanlon, who found no more than mild work-related mental health limitations.  She thus

concluded that any opinions asserting marked limitations were inconsistent with both objective and subjective record evidence.

The ALJ found that McDonough's RFC limitations rendered him unable to perform his past jobs as a waiter, gas station attendant, cook, or baker.  After considering McDonough's age, education, work experience, and RFC, the ALJ relied upon the vocational expert's testimony to support a finding that jobs existed in significant numbers in the national economy that McDonough could perform in the sedentary, unskilled occupational job base.  Therefore, the ALJ issued a finding of no disability.

## II.   __STANDARD OF REVIEW__

Under 42 U.S.C. § 405(g), I am authorized to review the pleadings submitted by the parties and the administrative record and enter a judgment affirming, modifying, or reversing the "final decision" of the Commissioner.  My review "is limited to determining whether the ALJ used the proper legal standards and found facts [based] upon the proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).

Findings of fact made by the ALJ are accorded deference as long as they are supported by substantial evidence.  Id. Substantial evidence to support factual findings exists "'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.'"

Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).   If the substantial evidence standard is met, factual findings are conclusive even if the record "arguably could support a different conclusion."  Id. at 770.  Findings are not conclusive, however, if they are derived by "ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam). The ALJ is responsible for determining issues of credibility and for drawing inferences from evidence in the record.  Irlanda Ortiz, 955 F.2d at 769.  It is the role of the ALJ, not the court, to resolve conflicts in the evidence.  Id.

### III.  **ANALYSIS**

McDonough argues that the ALJ erred by failing to (1) classify several of his impairments as severe at step two; (2) consider all of his impairments in determining his RFC; and (3) properly evaluate the medical opinion evidence supporting his claimed impairments.  I address each argument in turn.

#### A.  **Step Two Findings**

McDonough argues that the ALJ erred at step two when she found that his mental impairments, arthralgias, and chronic insomnia were not severe.  At the second step of the sequential

analysis, the ALJ considers the medical severity of the
claimant's impairments.  If the ALJ finds that the claimant does
not have a medically severe impairment, he or she is not
disabled.  20 C.F.R. § 404.1520(a)(4)(ii).  The First Circuit
has described the step two inquiry as a "de minimis policy,
designed to do no more than screen out groundless claims."
McDonald v. Sec'y of Health & Human Servs., 795 F.2d 1118, 1124
(1st Cir. 1986).

McDonough's argument might have merit if the ALJ's inquiry
had ended at step two.  This court has consistently held,
however, that an error in describing a given impairment as non-
severe is harmless so long as the ALJ found at least one severe
impairment and progressed to the next step of the sequential
evaluation.  See, e.g., Hines v. Astrue, No. 11-CV-184-PB, 2012
WL 1394396, at *12-13 (D.N.H. Mar. 26, 2012); Lawton v. Astrue,
No. 11-CV-189-JD, 2012 WL 3019954, at *7 (D.N.H. July 24, 2012);
see also SSR 85-28, 1985 WL 56856, at *3 (1985) (differentiating
claims denied at step two from those where "adjudication . . .
continue[s] through the sequential evaluation process").
Because the ALJ found a severe impairment and continued through
the sequential analysis, any error here was harmless.

**B.**   **Failure to Account for All Impairments in RFC**

McDonough argues that even if any error at step two was
harmless, the ALJ nevertheless erred in failing to consider the

27

limitations arising from McDonough's mental impairments, arthralgia, and chronic insomnia when crafting his RFC.

An ALJ's RFC "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" Stephenson v. Halter, 2001 DNH 154, 4-5. If the ALJ acknowledged an ailment and then "deemed [it] to be non-severe, he was still required to consider [it] in determining [the] claimant's RFC and in assessing whether she was precluded from performing her past relevant work." Id.; see 20 C.F.R. § 404.1523; SSR 96-8P, 1996 WL 374184, at *5 (July 2, 1996). Although the ALJ must consider all non-severe impairments, he or she is given considerable latitude in how to do so.

The ALJ discussed McDonough's arthralgias at step two by citing record evidence finding them well-controlled by various pain treatments. Moreover, at step two the ALJ explained that arthritic-type joint pain from arthralgias is symptomatic of hepatitis C – a finding grounded in the notes of McDonough's treating physicians. The ALJ factored this pain into her RFC determination, where she explained in detail McDonough's physical limitations credibly arising from such pain. This constitutes sufficient consideration of McDonough's arthralgias.

The ALJ also discussed each mental health diagnosis in McDonough's record, relying upon medical opinions and other record evidence to describe why she found each mental impairment

to be non-severe.  She expressly noted McDonough's panic
disorder and depression at step four.  She also explained that
in considering McDonough's mental limitations she accorded great
weight to the opinions of Drs. Martin and Scanlon, who found
that McDonough's mental impairments resulted in no more than
mild work-related mental health limitations.

McDonough argues that the ALJ's consideration of her
mental impairments was nevertheless insufficient because step
four requires a more detailed mental RFC than the ALJ provided,
as well as an application of the psychiatric review technique
specified in the applicable regulations.  See 20 C.F.R. §
404.1520a.[4]  The ALJ applied the psychiatric review technique at
step two, finding either mild or non-existent limitations in
each functional area.  Consequently, the ALJ permissibly found
McDonough's mental impairments to be non-severe.  See id. §
404.1520a(d)(1).  In explaining his RFC, she concluded that
McDonough's activities of daily living were "highly
inconsistent" with a finding of total disability.  Moreover, as
discussed above, the ALJ addressed McDonough's mental
impairments at step four and cited medical opinions, including

---

[4] The psychiatric review technique requires that when the ALJ
assesses a claimed mental impairment, he or she must make a
specific finding as to the degree of limitation in each of four
broad functional areas: activities of daily living; social
functioning; concentration, persistence, or pace; and episodes
of decompensation.  Id. at § 404.1520a(c)(3).

Dr. Martin's psychiatric technique review form, to explain why McDonough's impairments resulted in no more than mild work-related limitations.  The ALJ consistently explained throughout her decision why McDonough's mental health impairments resulted in at most mild limitations that would not affect his ability to perform the range of jobs at a sedentary exertional level.  The ALJ's RFC determination as it pertains to treatment of McDonough's mental health impairments is thus sufficiently supported by the record.  See Ramos v. Barnhart, 119 F. App'x 295, 296-97 (1st Cir. 2005) (per curiam).

McDonough also notes that the ALJ did not mention his insomnia anywhere in her decision even though on at least one occasion, McDonough was diagnosed with insomnia and prescribed medication to alleviate sleep-related problems.  Tr. at 633-34. McDonough also frequently reported difficulty sleeping to medical providers.  An ALJ, however, "is not obliged to expressly address each of a claimant's diagnoses," but rather must consider "the limiting effects of all the claimant's impairments, both severe and non-severe . . . .  [T]he mere diagnosis of [a] condition alone . . . reveals nothing about the limiting effects on [a claimant's] ability to function." Coppola v. Colvin, 2014 DNH 033, 5-6 (internal citations and quotation marks omitted); see also NLRB v. Beverly Enters. Mass., Inc., 174 F.3d 13, 26 (1st Cir. 1999) (ALJ is permitted

to "consider all the evidence without directly addressing in [his or her] written decision every piece of evidence submitted by a party.").

McDonough only claims that he was diagnosed with insomnia; he provides no discussion of any limiting effects arising from that diagnosis that the ALJ should have considered or incorporated into the RFC.  The one diagnosis of insomnia, by Dr. Reape, is not accompanied by a discussion of any limiting effects.  Apart from a single reference by Nurse Copanas, who marked a box for sleep disturbance as a symptom of McDonough's impairments, none of the other medical opinions mention a diagnosed sleep disorder or insomnia.  The only other available evidence on the issue comes from McDonough's complaints of trouble sleeping, and the ALJ considered McDonough's statements concerning the intensity, persistence, and limiting effects of his symptoms and determined that they were not credible to the extent they were inconsistent with her RFC determination.  Given the dearth of evidence of functional limitations, I conclude that the ALJ adequately considered McDonough's insomnia in crafting his RFC.

C. **Opinion Evidence**

McDonough next argues that the ALJ improperly weighed medical opinions and evidence.  I first outline the general requirements for weighing such evidence before separately

addressing the ALJ's treatment of the medical opinions relating to McDonough's mental and physical impairments.

An ALJ is required to evaluate "all of the relevant evidence," including each medical opinion. SSR 96-8p, 1996 WL 374184, at *5. Generally, an ALJ should accord the greatest weight to the opinion of a claimant's treating source, less weight to an examining source, and the least weight to a non-examining source. See 20 C.F.R. § 404.1527. This general rule, however, is tempered by the ALJ's responsibility to resolve any conflicts in the evidence. Irlanda Ortiz, 955 F.2d at 769. In examining the record and arriving at her decision, the ALJ can "piece together the relevant medical facts from the findings and opinions of multiple physicians." Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 144 (1st Cir. 1987). An opinion from a treating source can be accorded little weight - less than that accorded a non-treating source - if the ALJ finds the opinion to be inconsistent with other substantial evidence in the record. Ferland v. Astrue, 2011 DNH 169, 10; SSR 96-2p, 1996 WL 374188, at *2 (July 2, 1996). In such circumstances, he or she must give "good reasons" for the weight assigned to the opinion and apply a number of factors to reach this determination.[5] Sibley ex rel. Sibley v. Astrue, 2013 DNH 022,

_____

[5] The factors are: the length of the treatment relationship and frequency of examination; the nature and extent of the

16 & n.5 (citing Polanco-Quinones v. Astrue, 477 F. App'x 745, 746 (1st Cir. 2012)).

1.   Mental Health Evidence and Opinions

McDonough's arguments regarding the ALJ's consideration of the mental health record amount to two overarching critiques: that the ALJ erred in (1) ignoring significant mental health evidence; and (2) improperly weighing the various medical opinions.

**a.   The ALJ Did Not Ignore Mental Health Evidence**

McDonough contends that the ALJ erred in failing to discuss the treatment notes of Dr. Kuftinec, Dr. Santora, Kate Murphy and Tammy Numi.  An ALJ cannot ignore evidence, but he need not cite to every treatment note in the record, "so long as his conclusion is 'supported by citations to substantial medical evidence . . . and the unaddressed evidence was either cumulative . . . or otherwise failed to support the claimant's position.'"  Dube v. Astrue, 781 F. Supp. 2d 27, 34 n.11 (D.N.H. 2011) (quoting Lord v. Apfel, 114 F. Supp. 2d 3, 13 (D.N.H. 2000)).  The aforementioned treatment notes were either incorporated into a medical expert's opinion that the ALJ

---

relationship; the extent to which medical signs and laboratory findings, and the physician's explanation of them, support the opinion; the consistency of the opinion with the record as a whole; whether the treating physician is a specialist in the field; and any other factors that tend to support or contradict the opinion.  20 C.F.R. § 404.1527(c)(2-6).

expressly considered or cumulative of the opinions of nurse
Copanas and Drs. Scanlon, Martin, Reape, and Goss.  The ALJ met
her burden.[6]

McDonough also argues that the ALJ failed to address the
medical opinions of the psychiatrists who completed McDonough's
intake and discharge summaries from his March 2010
hospitalization.  As discussed above, an ALJ need not expressly
mention each piece of evidence in arriving at his or her
conclusion.  If the evidence were a medical opinion from a
claimant's treating provider, the ALJ would be required to
explain in writing the weight accorded to the opinion.  Id.
(citing 20 C.F.R. § 404.1527(d)(2)).  Neither psychiatrist
qualifies as a treating source because neither had an ongoing
treatment relationship with McDonough beyond the intake and
discharge summaries.  See 20 C.F.R. § 404.1502.  Further, the
ALJ's discussion of McDonough's hospitalization is sufficient
consideration of the relevant evidence.  She need not do more.[7]

---

[6] McDonough also argues that the ALJ impermissibly relied upon
her own lay assessment of McDonough's mental impairments.  That
is not the case.  The ALJ relied upon the medical opinions of
Drs. Martin, Scanlon, and MacEachran in finding no disability.
In arriving at her decision, the ALJ discussed the record
evidence to explain why she accorded great weight to their
respective opinions.  In so doing, she did not turn a blind eye
to conflicting evidence or medical opinions.

[7] The New Hampshire Disability Determination Service found that
McDonough's mental impairments qualified him as disabled under
state law and McDonough argues that the ALJ erred by failing to

b.   **Weight of Respective Opinions**

McDonough also argues that the ALJ impermissibly accorded great weight to the opinions of Drs. Scanlon and Martin and insufficient weight to those of Dr. Goff and Nurse Copanas.

He first argues that the ALJ could not give substantial weight to Dr. Scanlon's opinion because it is based upon incomplete knowledge gained from examining only two prior medical records and conducting a single forty-five minute psychological examination.  See Doc. No. 11-1 (citing Padilla v. Barnhart, 186 F. App'x 19, 20 (1st Cir. 2006)).  I reject this argument.  The ALJ did not base her determination solely on Dr. Scanlon's opinion.  Instead, she also relied upon Dr. Martin's opinion finding McDonough's mental impairments to be non-severe. Dr. Martin adopted much of Dr. Scanlon's opinion after considering it alongside Drs. Goss's and Kuftinec's opinions, the two other mental health opinions existing at the time of his consultation.  Dr. Martin also explained that he accorded Dr. Scanlon's opinion the most weight on the basis of the amount of objective evidence that she provided "while the other sources

discuss those findings.  I disagree.  "A state determination is not, in and of itself, evidence of disability."  Dube, 781 F. Supp. 2d at 37 n.16.  Courts have thus found that ignoring an administrative conclusion is not error per se.  Id. (citing Evans v. Barnhart, No. 02-459-M, 2003 WL 22871698, at *6 (D.N.H. Dec. 4, 2003)).  Moreover, the ALJ did not ignore the relevant evidence in the state record, but rather examined Dr. Goss's opinion – the primary evidence underlying the state's disability finding – and described why she accorded it limited weight.

offer little if any evidence to support any opinions they
assert." Tr. at 477.  There is no error if the ALJ relied only
in part upon Dr. Scanlon's opinion and in part upon other
substantial evidence.  See Coppola, 2014 DNH 033, 22-23 (finding
no error when the ALJ relied in part upon a consultant who
viewed an incomplete record, but primarily upon a second medical
opinion that considered a more complete record).  Substantial
evidence thus supports the ALJ's reliance upon the opinions of
Drs. Scanlon and Martin.

        McDonough also argues that the ALJ impermissibly accorded
great weight to Dr. Martin, a non-examining physician.
McDonough contends that the incomplete mental health records
available to Dr. Martin, including Nurse Copanas' RFC
assessment, prohibited any substantial reliance upon his
opinion.  I disagree.  The ALJ permissibly relied upon Dr.
Martin's opinion, finding it to be consistent with "the
claimant's subjective reports made during [Dr. Scanlon's]
examination," the objective evidence on record, McDonough's
subjective statements, and his reported activities of daily
living.  As explained above, Dr. Martin relied upon the opinions
of Drs. Scanlon, Kuftinec, and Goss in arriving at his decision.
He determined that Dr. Scanlon's report provided the most
objective evidence whereas the others provided little support.
Dr. Martin's opinion relied upon substantial evidence; the ALJ

                                    36

could thus permissibly accord it great weight.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d at 275 n.1.  That Drs. Scanlon and Martin did not receive later medical reports, including Copanas's evaluation, prior to issuing their opinions is immaterial.  Although Copanas's opinion was drafted months later, McDonough has presented no evidence of impairments or limitations that came to light during the intervening time period that were not present at the time of Dr. Scanlon's evaluation or Dr. Martin's opinion.  See Ferland, 2011 DNH 169, 11.

McDonough also argues that Copanas's and Dr. Goss's opinions deserved greater weight because they were consistent with each other and with treatment records from Greater Nashua Mental Health Center.  I disagree.  The ALJ explained that Copanas's and Dr. Goss's opinions were inconsistent with record evidence, ranging from McDonough's actions and statements at Dr. Scanlon's evaluation to his reported activities.  The ALJ permissibly discredited these opinions, choosing instead to rely upon Drs. Martin and Scanlon.  She was entitled to come to this conclusion.  See Arroyo v. Sec'y of Health & Human Servs., 932 F.2d 82, 89 (1st Cir. 1991) (per curiam).

2.  Physical Opinion Evidence

McDonough takes issue with the relative weight accorded to the opinions of Drs. MacEachran and Reape with respect to his

physical impairments.  These two opinions are substantially similar, though Dr. Reape found McDonough had a sedentary work capacity and Dr. MacEachran found him capable of performing light work.  Dr. Reape also found additional environmental limitations beyond those found by Dr. MacEachran.

In according Dr. MacEachran's opinion great weight, the ALJ found it to be "generally consistent with the totality of the medical evidence on record."  Tr. at 16.  Dr. MacEachran comprehensively reviewed McDonough's medical record, including the treatment notes of Drs. Sharma, Dennis, Gonzalez, and Reape, and described McDonough's activities of daily living before finding his complaints of pain to be only partially credible. Tr. at 491.  In deeming Dr. Reape's opinion to be of "limited weight," the ALJ cited inconsistencies with both objective record evidence and McDonough's activities of daily living.  She noted that many of McDonough's daily activities do not square with Dr. Reape's physical limitations.  Dr. Reape's opinion was not wholly rejected, however; the ALJ incorporated his environmental limitations concerning "hazards, temperature extremes, and pulmonary irritants" into the RFC.

The ALJ composed the physical portion of the RFC from the relevant facts and findings, see Evangelista, 826 F.2d at 144, incorporating Dr. Reape's environmental limitations and choosing to adopt Dr. MacEachran's opinion regarding McDonough's work

38

capacity.  Dr. Reape was a treating physician for part of
McDonough's alleged period of disability whereas Dr. MacEachran
was a non-examining medical consultant, but the ALJ was entitled
to accord greater weight to the latter opinion given her
explanation that it was more consistent with the medical
evidence.  See Keating, 848 F.2d at 275 n.1.  The ALJ cited to
the objective medical evidence of record, Tr. at 15, which was
"highly inconsistent" with McDonough's reported activities of
daily living.  She relied upon substantial evidence; hence there
was no error.[8]

### IV.  <u>CONCLUSION</u>

For the foregoing reasons, I grant the Commissioner's
motion to affirm (Doc. No. 14) and deny McDonough's motion to
reverse (Doc. No. 11).  The clerk is directed to enter judgment
accordingly and close the case.

---

[8] McDonough also contends that the ALJ's finding that he could
stand and walk for four hours in a workday impermissibly
misstated Dr. MacEachran's opinion, which concluded that
McDonough was limited to standing and/or walking for two to four
hours in an eight hour workday.  Tr. at 485.  Two hours, argues
McDonough, is therefore the maximum duration that he can stand
and/or walk on a sustained basis, which would limit McDonough to
sedentary work.  See SSR 96-8p, 1996 WL 374184, at *1.  I am not
convinced.  Dr. MacEachran found that McDonough could stand
and/or walk for up to four hours.  It was permissible for the
ALJ to incorporate the high end of this range into the RFC.  See
<u>id.</u> ("RFC is not the <u>least</u> an individual can do despite his or
her limitations or restrictions, but the <u>most</u>.").

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

June 23, 2014


cc:  Janine Gawryl, Esq.
     T. David Plourde, Esq.